UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| - v. - : | 18 Cr. 634 (AKH) |
| MARY BOONE, : | |
| Defendant. : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S SENTENCING MEMORANDUM
## REGARDING DEFENDANT MARY BOONE

 

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
Attorney for the United States of America

OLGA I. ZVEROVICH
Assistant United States Attorney
- Of Counsel -

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**UNITED STATES OF AMERICA**          :

    - v. -                                                      :

                                                                    **18 Cr. 634 (AKH)**

**MARY BOONE,**                                        :

                **Defendant.**        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**GOVERNMENT'S SENTENCING MEMORANDUM**
**REGARDING DEFENDANT MARY BOONE**

The Government respectfully submits this memorandum for the Court's consideration in connection with the sentencing of defendant Mary Boone ("Boone" or "the defendant"), which is scheduled for January 18, 2019, at 11 a.m. Boone pleaded guilty to two counts of subscribing to false and fraudulent federal income tax returns for the calendar year 2011. Boone subscribed to these false and fraudulent tax returns as part of a large, multi-year tax fraud scheme that resulted in an actual tax loss to the U.S. Treasury of over $3 million, not including penalties or interest. Boone was the sole architect and beneficiary of this tax fraud scheme and, contrary to her assertions now, engaged in it out of pure greed—to line her own pockets by cheating the system. The Government respectfully submits that this serious criminal conduct warrants a sentence within the stipulated Guidelines range of 30 to 37 months' imprisonment (the "Stipulated Range") and that a lower sentence would fail to serve the essential sentencing goals of affording general deterrence and promoting respect for the law.

**I.      Factual Background**

Boone, an experienced businessperson and owner of Mary Boone Gallery (the "Gallery"), willfully perpetrated a scheme to evade paying millions of dollars in federal income taxes for the calendar years 2009 through 2011. (PSR ¶ 16). During each of these years, Boone regularly and

repeatedly provided false records to her outside accountant and thereby caused the accountant to prepare false tax returns for herself and the Gallery that (a) grossly understated Boone's personal income by fraudulently characterizing personal expenses as tax-deductible business expenses and failing to report cash that Boone withdrew from the business as personal income to Boone, and (b) fraudulently reported that the Gallery incurred business losses, whereas, in reality, the Gallery was making large profits every year.  (PSR ¶¶ 16, 21).  Boone willfully signed these false returns under penalty of perjury and caused them to be filed annually with the IRS.  (PSR ¶¶ 34, 44).  Over the course of the three years, Boone's fraudulent scheme resulted in an actual tax loss to the IRS of at least $3,097,160 (not including any penalties or interest), which Boone pocketed.  (PSR ¶ 16).

      The first aspect of Boone's tax fraud scheme involved converting the Gallery's funds to her personal use without paying federal income taxes on the money that Boone spent and withdrew. Between 2009 and 2011, Boone used approximately $1.66 million of the Gallery's funds to pay for personal expenses and, instead of properly declaring these expenditures as personal income and paying income tax thereon, Boone fraudulently claimed them as tax-deductible business expenses. (PSR ¶¶ 36 ($72,628 in 2009), 41 ($313,850 in 2010); 22 ($1.28 million in 2011)).  In 2011, Boone used business funds to pay approximately $1.28 million in personal expenses, including $793,003 to remodel Boone's Manhattan apartment; $120,856 for rent and expenses for a second Manhattan apartment; and approximately $300,000 in personal credit card charges for, among other things, purchases at a beauty salon ($24,380.73), a jewelry company ($14,960.41), and luxury designer companies, such as Hermes ($13,937.71) and Louis Vuitton ($5,643.32).  (PSR ¶¶ 22-23, 27).  In 2009 and 2010, Boone used business funds to pay for an additional approximately $386,478 in personal expenses, including a $52,628 tuition payment for her son and a $20,000 rent payment.  (PSR ¶¶ 36-38, 41).

To evade paying federal income taxes on this significant personal income, Boone falsely and fraudulently characterized her personal expenses as tax-deductible business expenses on the handwritten check registers that Boone provided to her accountant on a monthly basis. (PSR ¶¶ 24-26, 36-38, 41). For example, Boone fraudulently reported two 2011 payments totaling $600,000 to the remodeling contractor for Boone's Manhattan apartment under the business expense categories "commission" and "fee/design," and fraudulently reported payments for her personal credit card charges under categories such as "cartage," "meals," "show," or "office supplies." (PSR ¶¶ 24, 27). In addition to falsifying check registers, Boone also engaged in dummy financial transactions as part of her scheme to disguise her personal expenses as business expenses. (*See* PSR ¶¶ 37-38). For example, prior to purchasing the $52,628 bank check for her son's tuition in 2009, Boone wrote four checks from a Gallery account totaling $52,628 and deposited the checks into the same account, causing four sets of debits and credits in the same amount to occur. (PSR ¶ 37). Boone then fraudulently characterized the four debits as different tax-deductible business expenses in the check registers that she provided to the accountant. (*Id.*).

In addition to disguising approximately $1.66 million in personal expenses as tax-deductible business expenses, Boone also took over $560,000 in cash from the business between 2009 and 2011 by withdrawing cash from the Gallery's bank account and cashing business checks. (PSR ¶¶ 28-29, 39, 42). With regard to some of this cash—approximately $79,299.39 that Boone withdrew from the Gallery's account in 2011 by writing fifteen checks "to cash"—Boone engaged in the same scheme, falsely and fraudulently claiming the cash as business payments to a printing company. (PSR ¶ 28). With regard to the rest of the cash, totaling approximately $481,404 over the three years, Boone did not report it at all. (PSR ¶ 39 ($49,923 in 2009); ¶ 42 ($139,684 in 2010); ¶ 29 ($291,797 in 2011)).

In all, Boone evaded paying any federal income tax on approximately $2.2 million in

3

business funds that she spent and withdrew between 2009 and 2011.

The second aspect of Boone's tax fraud scheme involved artificially inflating the Gallery's stated expenses and, to a lesser degree, the Gallery's stated income in such a way as to fraudulently generate business losses when, in reality, the Gallery was generating profits each year.  (PSR ¶¶ 31, 40, 43).  Boone did so through complex financial machinations and further falsification of the check registers provided to the accountant.  For example, in 2011, Boone transferred approximately $9.5 million from one business bank account to another.  (PSR ¶ 32).  Boone falsely reported these simple account transfers as tax-deductible business expenses, such as commissions to artists, on the check registers that Boone provided to the accountant (and withheld from the accountant the bank records that would have revealed the fraud).  (*See id.*).  Boone also created phantom financial transactions by writing out business checks and depositing them into the same business account, creating debits and corresponding credits in the same amount.  (PSR ¶¶ 31, 40).  Again, these transactions had no substance, but Boone used them to further the tax fraud scheme by reporting the credits and debits as income and expenses in the check registers provided to the accountant.  (*See id.*).  During the course of the fraud, while causing the Gallery's partnership returns to report false business losses, Boone maintained an internal set of books and records that showed that, in reality, the Gallery was generating a profit every year.  (PSR ¶ 45).

Boone's multi-year tax fraud scheme resulted in a significant pecuniary loss to the IRS.  In 2009, Boone evaded approximately $1,125,444 in federal taxes and falsely reported a zero tax liability on her 2009 Form 1040.  (PSR ¶¶ 40, 47).[1]  In 2010, Boone evaded approximately $750,335 in federal taxes and again falsely reported a zero tax liability on her 2010 Form 1040.  (PSR ¶ 43).  In 2011, Boone evaded approximately $1,221,381 in federal taxes and reported a tax

---

[1] There is an error in paragraph 40 of the PSR: the amount of taxes that Boone evaded in 2009 is $1,125,444, not $1,225,444.  (*See* PSR ¶ 47).

4

liability of $335 on her 2011 Form 1040.   (PSR ¶ 33).

From 2009 through 2011, Boone also cheated on her taxes by collecting hundreds of thousands of dollars in sales taxes from customers who purchased works of art from the Gallery and then failing to turn over most the collected sales tax to New York State.   (PSR ¶ 46).

On September 5, 2018, Boone pleaded guilty to two counts of subscribing to false and fraudulent tax returns for 2011, pursuant to a plea agreement.   In the plea agreement, Boone stipulated to a Guidelines range of 30 to 37 months in prison based on a tax loss of $3,097,160 (which takes into account the fraud in 2009 and 2010 as relevant conduct).   (PSR ¶¶ 5-12).   The Presentence Investigation Report ("PSR") contains the same Guidelines calculation as that set forth in the plea agreement.   (PSR ¶¶ 55-69, 99).

## II.     Sentencing Legal Principles

The Guidelines are no longer mandatory, but they continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways."   *United States* v. *Booker*, 543 U.S. 220, 252 (2005); *see also United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").   "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."   *Gall* v. *United States*, 552 U.S. 38, 49 (2007).   The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion.   *Molina-Martinez* v. *United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh* v. *United States*, 133 S. Ct. 2072, 2087 (2013)) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the

factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States* v. *Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)). Section 3553(a) further directs the Court "in determining the particular sentence to impose" to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

In light of *Booker*, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id*. at 112; *see also United States* v. *Corsey,* 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."). Second, the Court must consider whether a departure from that Guidelines range is appropriate. *See Crosby*, 397 F.3d at 112. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id.* at 113. In so doing, it is entirely proper for a judge to take into consideration his or her own sense of what is a fair and just sentence under all

the circumstances.  *United States* v. *Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

**III.    Section 3553(a) Analysis**

The Government respectfully submits that a sentence within the Stipulated Range of 30 to 37 months' imprisonment is necessary to reflect the seriousness and gravity of Boone's offense conduct, provide just punishment, afford general deterrence, and promote the respect for the law.

   **A. Nature and Circumstances of the Offense**

Tax fraud is theft from the pockets of every taxpaying citizen of this nation.  The Supreme Court has long-recognized that "[t]he United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received."  *Spies* v. *United States*, 317 U.S. 492, 495 (1943).  A functioning government relies on its citizens and residents to report timely, completely, and honestly all taxes they owe, which is why Congress has made it a criminal offense to file false returns or evade income taxes.  As Justice Oliver Wendell Holmes stated, "[t]axes are what we pay for a civilized society . . . ."  *Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, *J.*, dissenting).

The multi-year tax fraud that Boone perpetrated in this case cost the U.S. Treasury, and this nation's honest taxpayers, more than $3 million in actual losses, as well as the interest that would have accumulated on these unpaid taxes over time.  The magnitude of Boone's fraud itself warrants a sentence within the Stipulated Range.  Moreover, the offense conduct in this case is further aggravated by the *manner* in which Boone carried out her tax fraud scheme.  Boone's theft of over $3 million from the U.S. Treasury was not a one-time mistake or a fleeting lapse in judgment.  Time and time again, over the course of three years, Boone made a conscious and deliberate choice to defraud the U.S. Government by engaging in dummy financial machinations at the bank, falsifying bank check registers, providing the false check registers to her accountant on a

7

monthly basis, and signing false tax returns under penalty of perjury for three years in a row.  This prolonged and serious criminal conduct warrants a term of incarceration within the Stipulated Range.

### B. History and Characteristics of the Defendant

Unlike many of the defendants who appear before this Court, Boone has enjoyed great financial stability and comfort as a talented and successful art gallery owner—an advantage most people can only dream about.  But it wasn't enough.  Despite her success and wealth, Boone engaged in a multi-million-dollar tax fraud scheme that involved a high degree of deceit.  This was plainly a crime of opportunity driven by greed, not necessity.  But even now, as she stands to be sentenced, Boone cannot truthfully acknowledge her motivation to the Court.  Instead, Boone claims that she was "simply chasing success itself, for the sake of being successful" (Defendant's Sentencing Memorandum ("Def. Mem.") at 5, ECF No. 17) and that her three-year tax fraud scheme was "driven by a feeling of inevitable doom that blinded her from recognizing the true gravity of her actions" (*id.* at 8).  The Court should reject these claims.  Defrauding the U.S. Treasury of $3 million is not chasing "success"—it is chasing money.  The record shows that Boone knew full well that she was committing a crime, but she chose to do it anyway.  (*See* Def. Mem. at 8 (Boone "knew that the conduct at issue in this case was wrong")).  Moreover, if, as she now claims, Boone committed the tax fraud out of "a feeling of inevitable doom" (*id.* at 8) or an "irrational fear that everything would fall apart" (*id.* at 5), she would have, at the very least, saved her undeclared, untaxed income rather than spending nearly $800,000 of it on renovations for a high-end Manhattan apartment and hundreds of thousands more on personal credit card charges for Louis Vuitton and other luxury purchases.  Boone's conduct clearly demonstrates that she was motivated by greed and a desire to maintain her lavish lifestyle, even if it meant breaking the law.

(PSR at 25).[2]

Boone has submitted numerous letters attesting to her positive personal and professional qualities and expressing support. It is, of course, appropriate for the Court to take these letters into account in connection with sentencing. However, these attestations to Boone's positive qualities do not distinguish her from the typical defendant in a white-collar case and do not warrant a departure or variance from the Stipulated Range. As Judge Marrero observed in another case, this collection of letters:

> falls into a pattern advanced by a subset of the white collar criminal. This category encompasses a select class: distinguished, reputable, highly esteemed model citizens such as this defendant. The list of their achievements and virtues is long and impressive. Let us count the ways. At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors.

*United States* v. *Regensberg*, 635 F. Supp. 2d 306 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d Cir. 2010); *see also United States* v. *McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) ("excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her"); *United States* v. *Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts," and the defendant "should not be allowed to treat charity as a get-out-of-jail card" (citation and internal

---

[2] Boone also argues that if her criminal conduct had been "driven solely by greed and a desire for money," she "would not have been eager to pay back the taxes she owes," which she did prior to sentencing. (Def. Mem. at 4-5). This claim is disingenuous. As discussed below, the Government first contacted Boone in connection with its investigation in 2012; if Boone truly wished to make amends, she would have filed amended returns and paid back the money she stole years ago—if not before, certainly soon after, the Government first contacted her. Instead, Boone did not make any effort to pay back what she stole until sentencing was looming.

quotation marks omitted)). The Government does not question that Boone is a talented, accomplished, and influential person who has helped many others in her career. But these positive qualities, while admirable, do not set Boone apart from other similarly situated white-collar defendants—individuals who, although high-achieving and successful in their fields, nonetheless choose to steal and defraud, and to hide that side of themselves, as Boone did, from their family, friends, and colleagues.

To the extent that Boone suggests that her humiliation and loss of social or professional standing as a result of her guilty plea warrant a lighter sentence (*see* Def. Mem. at 3 & n.2), this claim should be rejected. Any notion that highly successful white-collar criminals should be sentenced more lightly than defendants of a lower socioeconomic status cannot not be countenanced. "It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction." *United States* v. *Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012); *see also United States* v. *Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) ("In imposing a sentence of one day with credit for the day of processing, the district court relied heavily on the fact that Musgrave had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life. '[N]one of these things are [his] sentence. Nor are they consequences of his sentence'; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." (citation omitted)); *United States* v. *Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."). And, as the Seventh Circuit has observed:

[N]o "middle class" sentencing discounts are authorized. Business criminals are not to be

10

>  treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States* v. *Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (citation omitted).

Finally, as discussed above, this is *not* a case where the offense conduct was wildly aberrant or prompted by a brief lapse in judgment and where, as a result, it might be appropriate to give more weight to the defendant's otherwise law-abiding life. For over three years, Boone methodically perpetrated a tax fraud designed to cheat the IRS and New York State taxing authorities out of large sums of money. That cheating involved falsification of business records, repeated lies to Boone's accountant, and the signing of multiple false tax returns under penalty of perjury, year after year. This prolonged, greed-driven criminal conduct warrants serious punishment.

### C. The Need to Afford Adequate Deterrence

One of the paramount factors that the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). General deterrence is particularly important in cases like this because it is essential to reducing the ever-increasing amount of money lost each year through tax fraud. A recent IRS study of tax compliance estimates that only 83.1% of individuals are compliant with their tax obligations, leaving a yearly tax gap of over $458 billion dollars in unreported and uncollected taxes. *See* "Tax Gap Estimates for Tax Years 2008-2010," April 2016, *available at* https://www.irs.gov/pub/newsroom/tax%20gap%20estimates%20for%202008%20through%202010.pdf. This means that hundreds of billions of dollars are lost every year because people like Boone—who otherwise fully enjoy the myriad public benefits that the tax system supports—

11

choose to shirk their responsibilities as taxpayers. Widespread noncompliance with the Internal Revenue Code is an ongoing problem that merits the Court's strong consideration when imposing sentence. Meaningful sentences must be given in cases such as this to forewarn others of the consequences for engaging in multi-year tax fraud. *See* Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 Emory L.J. 265, 321 (2011) ("Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect.").

The importance of affording general deterrence through meaningful sentences is particularly acute in criminal tax cases. As a result of the significant resources required to mount a criminal tax prosecution, such prosecutions are relatively rare. As the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. ch. 2, pt. T, introductory cmt. Where the incidence of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence.

The need for general deterrence is greatest in cases involving particularly lucrative and difficult-to-detect tax fraud schemes. *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *see also United States* v. *Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a within-Guidelines 32-month sentence for a tax evader when the district court explained that "a sentence of

probation would not promote respect for the law, but encourage people to flaunt it"). Thus, in order to provide adequate general deterrence, sentences in long-running tax crimes with complex components, such as Boone's falsification of records and artificial inflation of income and expenses (which made her tax fraud difficult to detect), must be substantial.

Boone's requested sentence of home confinement or probation would fail *entirely* to serve the goal of general deterrence. The message that would be sent to the community by such a lenient sentence is that tax fraud is not a big deal and a that a lucrative three-year fraud yielding proceeds exceeding $3 million is, essentially, not worthy of serious punishment at all. Such a sentence would provide a would-be tax cheat every incentive to orchestrate a tax fraud scheme—the financial reward is very high, the chance of being caught and successfully prosecuted is very low, and the punishment in the unlikely event of a successful prosecution is minimal (home confinement and the requirement to pay back the stolen money, which should have been paid to the Government in the first place). Respectfully, that is *not* the message that this Court should send to the public through its sentence of Boone. As Judge Weinfeld aptly observed in a pre-Guidelines setting:

> This court has long had the view that income tax evasion cases where defendants are found guilty, whether upon their pleas of guilty or after jury verdict, require a term of imprisonment. The income tax laws of our country in effect reflect an honor system under which the citizens are required to cooperate with the government, to file true and accurate returns. I have been of the view that unless a citizen lives up to his responsibility there must follow, barring an extraordinary situation, a term of imprisonment as an example to other people in the community.

*United States* v. *Tana*, 85 Cr. 1119 (EJW) (June 17, 1986; Tr. at 12-13). Judge Gardephe echoed this view in a more recent case involving a defendant who utilized an undeclared Swiss bank account and caused hundreds of thousands of dollars of tax loss, resulting in a Guidelines range of 24 to 30 months:

> Our tax system is, at bottom, a voluntary one. Those who use sophisticated means of tax

> evasion, the sorts of sophisticated means seen here, when their activities come to light they must be punished in a manner that will discourage others from engaging in similar conduct. I believe in the views of Judge Weinfeld, for whom I have the greatest respect, and specifically his views as expressed in the case of United States versus Tana, that absent extraordinary circumstances, cases of significant tax evasion often call for a sentence of imprisonment. There's nothing about the facts here that suggest to me that a different outcome is appropriate.

*United States* v. *Werdiger*, 10 Cr. 325 (PGG) (November 9, 2011; Tr. at 49-50); *see also United States* v. *Trupin*, 475 F.3d 71, 76 (2d Cir. 2007) (holding that a seven-month prison sentence for multi-year tax evasion scheme with a tax loss of $1.2 million failed to reflect seriousness of offense, observing that a tax evader, in effect, "steal[s] from his fellow taxpayers through his deceptions"); *United States* v. *Engle*, 592 F.3d 495, 502 (4th Cir. 2010) ("Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.").

In a recent case involving a business owner defendant who diverted corporate receipts over a three-year period, resulting in a tax loss of between $250,000 and $550,000 and a Sentencing Guidelines range of 18 to 24 months, this Court imposed an 18-month sentence on the 54-year-old, first-time offender, explaining that:

> I think the obligation to pay taxes is basic to our civilization. It makes it possible to have a lawful society. You read every day of crimes and violence in our country. But so much so in so many other countries where people can't get out of their house without fearing their lives. Where the path of getting food is strewn with threats and violence against them.
>
> In order to have a society, you must have money. You must be able to pay what society requires. And its basic functions of policing and other functions of making sure there is a safety net under people. If people don't pay their taxes, they cheat each other. Your not paying taxes cheats me. If I don't pay my taxes, I cheat you. It's as bad, in many ways, as ripping off the delivery worker that the last fellow did. You're ripping off everybody else by not paying your share of taxes. So I look upon this and I think the guidelines have it right here. I think a year and a half, 18 months, is a just sentence. I impose it.
>
> I think you're going to have to reflect on what you did and the seriousness of what you did. You just can't make it good by paying the back tax. You've got to understand that when you do something bad, you get punished. It's got to be a lesson to everyone else. Everyone else is tempted to draw a line and cheat a little bit, get an extra edge.

Sentencing Tr., *United States* v. *Joseph Ciccarella*, 16 Cr. 738 (AKH), at 22-23 (attached hereto as Exhibit A).

In short, compliance with the Internal Revenue Code will be unattainable if the general public believes there are no meaningful repercussions for failing to comply with the tax laws. Sentencing Boone to a significant term of incarceration is, therefore, necessary to send the message to others in our society that systematic and repeated efforts to cheat on one's taxes will be met with serious punishment. Or as this Court succinctly put it in *Ciccarella*: "You've got to understand that when you do something bad, you get punished." *Id.*

### D. The Need to Avoid Unwarranted Disparities

The Sentencing Guidelines were promulgated, in significant measure, to minimize disparities in federal sentences. Although those Guidelines are no longer mandatory, the importance of eliminating sentencing disparities remains an important factor that the Court must consider pursuant to 18 U.S.C. § 3553(a)(6). To that end, the Government attaches for the Court's consideration a chart of sentences in other recent tax cases (or cases that had a significant tax component), including cases with comparable loss amounts to the loss amount in this case. (*See* Exh. B (the "Sentencing Chart")). The Sentencing Chart breaks out the sentences imposed and various other sentencing data in a broad variety of criminal tax contexts.

Although the Government believes that there is significant utility in having Your Honor consider sentencings in other tax cases, we note our acute awareness that, at best, such guidance can get the Court only so far. Every case is unique; every individual defendant is unique. We do not mean to suggest otherwise. The reason for our reference to the other relevant sentences is straightforward: while we fully recognize that the Government's recommendation in this case calls for a substantial sentence, similar sentences have been meted out in cases involving comparable

15

long-running criminal conduct and tax losses. In fact, as the attached chart shows, it is not uncommon for defendants who are *less* culpable than Boone to receive and serve lengthy sentences of incarceration.

### IV. Boone's Arguments

#### A. Boone's Mental Health Issues

Boone argues that a sentence of home confinement and probation is appropriate given her mental health issues and personal background. Boone's requested sentence, which represents a 100% departure from the Stipulated Range, is plainly unreasonable under the circumstances in this case. *See Gall* v. *United States*, 552 U.S. 38, 50 (2007) (the district court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance").

Part H of the Sentencing Guidelines provide that departures based upon a defendant's age, medical health, and mental status "may be relevant" in imposing a sentence, but only when those characteristics "are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. §§ 5H1.2, 1.3, 1.4. Boone does not have any conditions so severe as to meet the rigorous requirements for a downward departure based on health reasons. Notwithstanding her mental health issues, Boone has led, and continues to lead, a high-functioning life as a successful businessperson in the art world. In fact, Boone argues in another part of her sentencing submission that a jail sentence is inappropriate because she needs to continue running the Gallery. The Government in no way means to minimize Boone's personal or mental health issues or suggest that they are not real, but Boone needs to be held accountable for her serious criminal conduct, committed methodically and deliberately over the span of three years (notwithstanding any personal or mental health issues she was experiencing). *See United States* v. *Poetz*, 582 F.3d 835, 838 (7th Cir. 2009) (affirming a custodial sentence for a defendant with a

variety of different medical conditions where the sentencing judge "explained that despite Poetz's medical issues, a period of incarceration was 'fundamentally required' to promote respect for the law, provide for deterrence, and hold Poetz accountable for her breach of the trust placed in stewards of public funds"). Furthermore, the Federal Bureau of Prisons ("BOP") is well-equipped to address Boone's medical needs during a period of incarceration. *See* Exhs. C, D (describing the broad range of psychological and mental health services available at the BOP); *United States* v. *Perko*, 694 F. App'x 25, 29 (2d Cir. 2017) (summary order) (affirming an above-Guidelines two-year sentence and concluding that "the District Court took account of [the defendant's] mental health needs and concluded that the Bureau of Prisons, even if not the best provider of mental health services, has the ability and has the resources to give [the defendant] the help that he needs" (alterations and internal quotation marks omitted)); *see also United States* v. *Walker*, 27 F.3d 417, 419 (9th Cir. 1994) ("Post-arrest emotional trauma is a natural consequence of being charged with a crime. It is irrelevant for sentencing purposes.").[3]

### B. The Asserted Need to Continue Running the Gallery

Boone also seeks a 100% variance from the Stipulated Range based on a claim that if she "is sent to prison, the Galleries will be forced to close and Mary's employees will all lose their well-paying and career-making jobs." (Def. Mem. at 17). The Court should reject this argument. The Second Circuit has "held that a sentencing court may consider—in extraordinary cases—the strains that a criminal investigation places on a defendant's business." *United States* v. *Rattoballi*, 452 F.3d 127, 136 (2d Cir. 2006) (citing *United States* v. *Milikowsky*, 65 F.3d 4, 9 (2d Cir. 1995)).

---

[3] Boone also cites substance abuse issues with which she struggled earlier in her life. However, as noted in the defense submission, Boone "has now been sober and drug free for twenty years." (Def. Mem. at 26). The Government respectfully submits that, while helpful as background, Boone's decades-old substance abuse issues do not warrant any departure or variance from the Stipulated Range.

17

But as in *Rattoballi*, where the Second Circuit reversed the district court's imposition of a sentence of home confinement, "such circumstances are not present here." *Id.* Boone's skills and talents undoubtedly were critical to establishing the Gallery in the 1970s and making it a success, but there is no evidence that Boone is instrumental to the Gallery's day-to-day operations or that a period of incarceration would force the Gallery to shut down. The Gallery has another partner (Ron Warren) and other leadership and employees who can continue running the Gallery in Boone's absence.[4] Boone has been on notice of the Government's investigation for several years and has had ample opportunity to prepare for this scenario before sentencing. Moreover, any strain on the Gallery from Boone's incarceration is entirely the result of Boone's own decision to perpetrate a lucrative, long-running criminal tax fraud scheme using the Gallery's funds and, as such, is not a mitigating factor warranting a lesser sentence. *See Rattoballi*, 452 F.3d at 136 ("[W]e are disinclined to accord the prospect of business failure decisive weight when it is a direct function of a criminal investigation that had its origins in the defendant's own unlawful conduct.").

### C. Acceptance of Responsibility and Restitution

Boone argues that she "gave timely notification of her intention to plead guilty and voluntarily surrendered to the authorities," and that she "took these steps before being charged by a grand jury, thus saving the government the time and expense of presenting this case to a grand jury." (Def. Mem. at 4). Relatedly, Boone argues that she has "made full restitution to the IRS, paying all of the tax, and interest due in connection with her plea" and, "in addition to restitution for back taxes, Ms. Boone agreed to pay, and has paid, $2,313,264 in penalties." (Def. Mem. at 4). None of these arguments warrants a departure or variance from the Stipulated Range.

---

[4] During the recent sentencing in *United States* v. *Joseph Ciccarella*, this Court rejected the argument that the defendant should receive a non-incarceratory sentence because of the asserted need to continue running his business and found that the defendant's son could take over the business while the defendant served his sentence. (*See* Exh. A at 14-15; 20-21).

Having pled guilty, Boone is entitled to points for acceptance of responsibility, which already are fully reflected in the Stipulated Range.  *See Rattoballi*, 452 F.3d at 136 ("To eliminate [the defendant's] term of imprisonment altogether based on [his decision to plead guilty] would give him credit for cooperation twice[.]").   Notably, Boone had been aware of the Government's investigation since 2012 and expressed no interest in admitting her crimes or paying restitution until 2018, after the Government executed a search warrant at the Gallery.   The fact that following her plea, in an effort to get a lesser sentence, Boone finally paid back the money that she had stolen from the U.S. Treasury with interest and civil penalties is not a mitigating factor that should affect Boone's custodial sentence.   The Court should reject the notion that multi-millionaire defendants like Boone should get a get-out-of-jail-free card by virtue of their ability to pay restitution in a lump sum before sentencing.

**V.     Conclusion**

On the facts of this case, a sentence within the Stipulated Range of 30 to 37 months in prison is appropriate and just.   Such a sentence would reflect the seriousness of Boone's crimes, afford just punishment, and send a message to would-be tax cheats that a meaningful jail term is the likely consequence of such criminal conduct.   By contrast, a sentence involving minimal or no jail time, much less home confinement, would be perceived by the public as a slap on the wrist and would fail to deter anyone from flouting the tax laws.

Dated:  New York, New York
January 9, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:    _____/s/_____
Olga I. Zverovich
Assistant United States Attorney
(212) 637-2514

19